

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

January 13, 2020

The Honorable Stanley R. Chesler
United States District Judge
Frank R. Lautenberg Post Office
and U.S. Courthouse
2 Federal Square
Newark, NJ 07101

> RE: *United States v. Troy Porter*
> Crim. No. 18-244

Dear Judge Chesler:

The Government submits this letter brief in lieu of a more formal submission in response to Defendant Troy Porter's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Troy Porter ("Porter") moves this Court to be released from Federal Correctional Institution, Fort Dix, New Jersey ("FCI-Fort Dix") based on the threat posed to him by the COVID-19 pandemic as a ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████. This Court should deny Porter's motion. First, Porter's health conditions, coupled with the COVID-19 pandemic, do not qualify as an "extraordinary and compelling reason" to justify his release from prison. Moreover, even if Porter could satisfy the criteria for compassionate release, the § 3553(a) factors weigh against reducing his 84-month sentence. As detailed below, Porter committed a serious crime involving a firearm and drugs after accruing a substantial criminal record. Given these facts, Porter has not provided an adequate basis for a reduction in his sentence. Accordingly, as further detailed below, Porter's motion for compassionate release should be denied.

## Factual Background

### A.    Porter Admits to Unlawfully Possessing a Firearm

Porter's 84-month sentence stems from offense conduct that occurred on November 26, 2017. On that date, Newark Police Department officers traveled to

a vacant townhouse in a public housing complex in Newark, New Jersey where individuals were reported to be in possession of a firearm and narcotics and dealing drugs. Presentence Investigation Report dated July 2, 2018 ("PSR"), ¶9. There, Porter was found in possession of a Jiminez Arms .22 caliber pistol and six rounds of ammunition. PSR ¶¶ 10, 12. Newark Police also recovered 41 glassine envelopes containing heroin and fentanyl. PSR ¶12. Forty of the glassine envelopes were labeled "amazing" and one was labeled "bad medicine." PSR ¶12.

Thereafter, Porter was charged in a two-count complaint with illegal possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute heroin, in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(C). On April 26, 2018, Porter pleaded guilty before Your Honor, pursuant to a written plea agreement dated March 29, 2018, to a one-count Information, which charged him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Following Porter's guilty plea—and in accordance with the terms of his Rule 11(c)(1)(C) plea agreement—he was sentenced to 84 months' imprisonment.

## B.   Bureau of Prison's Response to the COVID-19 Pandemic

### 1.   Preventative Measures Taken at Bureau of Prison Facilities

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Federal Bureau of Prisons ("BOP") has taken measures to protect the health of the inmates in its charge. BOP has stated that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (last visited Jan. 8, 2021), *available at* https://www.bop.gov/resources/news/20200319_covid19_update.jsp.  Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP*, Pandemic Influenza Plan* (last visited Jan. 8, 2021), *available at* https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf).  That detailed protocol established a multi-phase framework that requires BOP facilities to begin preparations on learning of a suspected outbreak and addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, on March 13, 2020, BOP began to modify its operations to minimize the risk of COVID-19 transmission into and inside its facilities. BOP, *Agency-wide Modified Operations* (last visited Jan. 8, 2021), *available at* https://www.bop.gov/resources/news/20200313 _covid-19.jsp. Since that time, as events have required, BOP has revised the Action Plan to address the crisis. The current operations plan requires screening of inmates upon entry into BOP institutions. Procedures are also in place for transfers of inmates between institutions. In addition to screening and testing inmates,

temperature checks and COVID-19 screenings are being conducted for staff, contractors, and other visitors to correctional institutions, with those who register a temperature of 100.4° Fahrenheit or higher denied access to BOP facilities. As much as possible, staff are being assigned to the same posts and not rotating as an additional measure to mitigate the spread of the virus.

### 2. BOP's Home Confinement Initiatives

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion.

The BOP has considered many prisoners for home confinement following the above memoranda and BOP's implementation of the Memoranda has resulted in an increase in the transfer of inmates to home confinement. As of January 8, 2021, BOP has transferred approximately 20,053 inmates to home confinement. BOP, *COVID-19 Home Confinement Information* (last visited Jan. 8, 2021), *available at* https://www.bop.gov/coronavirus/.

### 3. Current Conditions at FCI-Fort Dix

Unfortunately, some facilities have been harder hit by the virus than others. And FCI-Fort Dix has been hit particularly hard. As of January 11, 2021, FCI-Fort Dix has 183 positive inmates. *See* Ex. A, Declaration in United States v. Hare, No. 18-cr-588, at ¶12.[1] Since the start of the pandemic, 943 inmates

---

[1] The Government is including a declaration by James Reiser, the Case Management Coordinator at FCI-Fort Dix, from a different case that describes the facility's response to the COVID-19 pandemic. According to Reiser, the

have tested positive at the institution and have since recovered, BOP, *COVID-19 Cases* (last visited Jan. 13, 2021), *available at* https://www.bop.gov /coronavirus/, and 68 staff members have tested positive and since recovered, *see* Ex. A, Declaration in United States v. Hare, No. 18-cr-588, at ¶14. Thankfully, FCI-Fort Dix has not suffered any inmate or staff deaths attributable to the COVID-19 pandemic. BOP, *COVID-19 Cases* (last visited Jan. 13, 2021), *available at* https://www.bop.gov /coronavirus/.

In response to the active cases at FCI-Fort Dix, the Warden has cancelled all visitations and activities involving volunteers. Inmate movement has also been greatly reduced to prevent the potential spread of the virus. Inmates currently only leave their unit for grab-and-go meals, scheduled medical appointments, and twice-weekly outdoor recreation.

## Legal Framework

It is well-established that "[o]nce a federally imposed sentence commences, a district court has limited authority to modify that sentence." *United States v. McNair*, 2020 WL 5036201, at *2 (D.N.J. Aug. 26, 2020) (Wolfson, C.J.) (citing *Dillon v. United States*, 560 U.S. 817, 825 (2010)). Under 18 U.S.C. § 3582(c)(1)(A), however, this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment. If the exhaustion requirement is met, the court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if it finds, as relevant here, that: (i) "extraordinary and compelling reasons warrant such a reduction"; and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

The defendant bears the burden of establishing that he is entitled to a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016) (18 U.S.C. § 3582(c)(2)); *United States v. Epstein*, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020) (Wolfson, C.J.) (18 U.S.C. § 3582(c)(1)(A)). As the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (citations omitted). "Mere speculation concerning possible future conditions does not constitute a compelling reason for release." *Epstein*, 2020 WL 2537648, at *6 (internal quotations omitted).

The Sentencing Commission has also issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if it finds that: (i) "extraordinary and compelling

---

number of confirmed active inmate cases on the BOP website is not up-to-date and therefore the Court should rely on the figures in his declaration.

reasons warrant the reduction"; (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. Under the explicit terms of § 3582, this policy statement is binding on the Court. *See Dillon*, 560 U.S. at 826 (in motion for a reduction in sentence under 18 U.S.C. § 3582(c)(2), Sentencing Commission's policy statement was binding upon Court).[2]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, the standard is met if a defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, App. Note 1(A)(i). Second, the standard is met if the defendant is:

(I)     suffering from a serious physical or medical condition,

(II)    suffering from a serious functional or cognitive impairment, or

(III)   experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility *and from which he or she is not expected to recover.*

U.S.S.G. § 1B1.3, App. Note 1(A)(ii) (emphasis added). The Application Note also sets out other conditions, not applicable here, that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.3, App. Note 1(B)-(C). Finally, the Application Note recognizes the possibility that the BOP could identify other grounds that amount to "extraordinary and compelling reasons."  U.S.S.G. § 1B1.13, App. Note 1(D).

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The inquiry does not end there. Even if the defendant has shown he is eligible for compassionate release based on "extraordinary and compelling reasons," the Court must still assess whether the factors under 18 U.S.C. § 3553(a) justify early release, including whether the defendant is a danger to the community under 18 U.S.C. § 3142(g).[3] *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13(2); *see also United States v. Pawlowski*, 967 F.3d 327, 329-30 (3d Cir. 2020) ("[B]efore granting compassionate release, a district court must 'consider[] the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable.'" (quoting 18 U.S.C. § 3582(c)(1)(A))).

The familiar provisions of section 3553(a) require the sentence to reflect the purposes of sentencing, which include: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). This Court must also consider, as relevant here, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guidelines range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

## Argument

### A.   Porter Has Exhausted His Administrative Remedies

Porter appears to have exhausted his administrative remedies. As set forth in Porter's Exhibit C, on or about July 30, 2020, Porter's request for a reduction of his sentence pursuant to § 3582 was denied. Because thirty days have since elapsed, the Court should consider the merits of Porter's motion.

### B.   Porter's Medical Issues Do Not Constitute an "Extraordinary and Compelling Reason" For Relief

---

[3]  Section 3142(g) sets forth factors that help courts assess whether releasing an inmate will pose a danger to others and the community, including "the nature and circumstances of the offense charged," "the history and characteristics of the person," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Porter's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A)(i).  The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include certain specified categories of medical conditions including (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. 1B1.13, cmt. n.1(A).

Porter has not established that any of his medical conditions— ████████ ██████████████████████████████████████████████ "substantially diminish" his ability to provide self-care in prison. To the contrary, Porter's hypertension is being treated through medication. Notwithstanding, Porter argues that his medical conditions put him at increased risk of serious complications if he contracts COVID-19. But as the Third Circuit has stated, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). This has been repeatedly echoed by courts within this District in decisions denying motions under § 3582(c)(1)(A).[4]

Of course, the COVID-19 pandemic and the risks it poses is relevant to the Court's determination of whether Brown has presented "extraordinary and compelling reasons" warranting his release. In the COVID-19 context, courts in this District and elsewhere have routinely looked to the U.S. Centers for Disease Control ("CDC") for guidance in determining whether certain medical conditions put a defendant at increased risk for severe illness due to COVID-19 and thus may present an extraordinary and compelling basis for release. *See e.g., United States v. Henderson*, 2020 WL 5055081, at *4 (D.N.J. Aug. 26, 2020) (discussing

---

[4] *See e.g., United States v. Durante*, 2020 WL 2520280, at *4 (D.N.J. May 18, 2020) (Chesler, J.) (citing *Raia* and stating, "the possibility that Covid-19 may spread to Durante's jail unit cannot, without more, justify compassionate release."); *United States v. Alexander*, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (denying a sentence reduction motion and citing *Raia*); *United States v. Brown*, 2020 WL 2466081, at *2-3 (applying *Raia* and stating that a release request "cannot be based solely on the fact that COVID-19 might spread further at [the facility where a defendant is incarcerated]").

CDC's list of medical conditions that increase a person's risk of severe illness from COVID-19 and noting that "courts around the country have used [the CDC's list] as a guidepost for determining whether extraordinary and compelling reasons exist in COVID-19 compassionate release cases").

Currently, the CDC has identified the following conditions as elevating an individual's risk of becoming seriously ill from COVID-19:

- cancer
- chronic kidney disease;
- chronic obstructive pulmonary disease;
- down syndrome;
- heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies;
- immunocompromised state from a solid organ transplant;
- obesity resulting from a body mass index of 30 or higher;
- severe obesity;
- pregnancy;
- sickle cell disease;
- smoking; and
- type 2 diabetes mellitus.

CDC, *People With Certain Medical Conditions* (last visited Jan. 8, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/peo ple-with-medical-conditions.html.[5] Age is also a factor that increases a person's risk of getting seriously ill from COVID-19. CDC, *Older Adults* (last visited Jan. 8, 2021), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. According to the CDC, "8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older." *Id.*

---

[5] The CDC further distinguishes between medical conditions that are consistently and directly linked to an increased risk of severe illness from COVID-19, and medical conditions that *might* present an increased risk of severe illness from COVID-19. CDC, *People With Certain Medical Conditions* (last visited Jan. 8, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. As of January 8, 2021, hypertension was among the conditions that only *might* present an increased risk of severe illness due to COVID-19. *Id.; see also United States v. Elliott,* 2020 WL 5517461, at *4 (D.N.J. Sept. 14, 2020) (distinguishing illnesses that increase the risk of severe illness from COVID-19 from those that "might" increase the risk of severe illness from COVID-19).

Here, none of Porter's medical conditions qualify him as an individual at increased risk of becoming seriously ill from COVID-19.



Moreover, courts have found that individuals with more serious health conditions and risk factors failed to establish an "extraordinary and compelling" basis for relief. *See, e.g., United States v. Falci,* 2020 WL 3410914, at *4 (D.N.J. June 22, 2020) (denying motion for compassionate release of 60 year defendant with hypertension, obesity, diverticulosis, and other conditions); *United States v. Terry*, 2020 WL 3264086, at *4 (D.N.J. June 17, 2020) (denying relief for "young man" suffering from Type 2 diabetes and hypertension); *Durante,* 2020 WL 2520280, at *2 (denying motion for compassionate release where defendant was a 66-year old man with hypertension); *United States v. Alexander*, 2020 WL 2507778, at *1 (D.N.J. May 15, 2020) (denying a motion for compassionate release where defendant suffered from hypertension and obesity"); s*ee also United States v. Fry*, 2020 WL 1923218 (D. Minn. Apr. 21, 2020) (denying motion for compassionate release of 66-year-old defendant with obesity, heart disease, and hypertension). Accordingly, Porter's medical conditions do not qualify him for release.

Porter further contends that he is at an increased risk of severe illness from COVID-19 because he is African American. As Chief Judge Wolfson recently explained, and numerous other courts have held, this contention does not establish "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1)(A):

[I]t is not clear that being African-American increases Defendant's risk of complications from the COVID-19, in the same manner as one's underlying medical conditions. Indeed, although African Americans are overrepresented in data regarding COVID-19

---

[6] The medical record from December 10, 2018 also states "5-6 Cigs/day" and "[q]uit since incarcerated." *See* Def. Br., D.E. 25, at 1 Ex. A, 6.

hospitalizations and deaths in America as a whole, this overrepresentation may result from other systemic economic and social issues affecting the African American community, including access to health care, higher prevalence of underlying conditions, and lack of access to health insurance. As such, it is unclear whether Defendant's race places him at a greater risk of contracting COVID-19, while he is incarcerated and receiving medical treatment . . . .

*Alexander*, 2020 WL 2507778, at *4 (internal citation omitted).[7]

The Government is sensitive to the issues Porter raises. But Porter's particular risk of potential exposure to COVID-19 is not an extraordinary and compelling reason to grant him compassionate release. *Raia*, 2020 WL 1647922 at *2 ("[T]he mere existence of COVID-19 . . . and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release []"); *United States v. Gileno*, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) (denying compassionate release because BOP's proposed plan adequately addresses the COVID-19 pandemic). Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention otherwise would be warranted. *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (considering pretrial detention). In this case, Porter has failed to carry his burden of demonstrating that his health conditions justify his release.

## C.    The 3553(a) Factors Weigh Strongly Against Release

---

[7] *See also United States v. Green*, 2020 WL 3642860, at *4 (W.D. Pa. July 6, 2020) (denying motion for compassionate release and noting that while "[c]urrent data suggests that African-Americans have been disproportionately affected by COVID-19 hospitalizations and deaths[,] [i]t is unclear, however, whether race is an independent risk factor or whether the adverse outcomes are caused by other factors such as living conditions (such as population density), work conditions (including service in essential industries), lack of access to health care or the prevalence of other underlying medical conditions"); *United States v. Leigh-James,* 2020 WL 4003566, at *4 (D. Conn. July 15, 2020) (rejecting defendant's contention that his race constituted an extraordinary and compelling reason warranting compassionate release); *United States v. Wade*, 2020 WL 3254422, at *3 (N.D. Cal. June 16, 2020) (internal citations omitted) (rejecting defendant's motion for compassionate release based on his race or ethnicity).

Even if Porter satisfied the criteria required for compassionate release, this Court should still deny his motion because the § 3553(a) factors weigh in favor of requiring him to continue serving his sentence to its conclusion.

First, Porter's offense was unquestionably serious. 18 U.S.C. § 3582(a)(1), (a)(2)(A). Unlawful possession of a weapon is an inherently violent offense. Moreover, Porter was arrested with a loaded handgun that was recovered in close proximity to 41 glassine envelopes containing heroin and fentanyl. The danger posed by the heroin and fentanyl cannot be overstated; in 2019 alone, 2,583 individuals died in New Jersey from overdoses attributed to opioids including heroin and fentanyl. National Institute on Drug Abuse, *New Jersey: Opioid-Involved Deaths and Related Harms* (last visited Jan. 8, 2021), *available at* https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/new-jersey-opioid-involved-deaths-related-harms. The seriousness of Porter's offense weighs against his release

Second, Porter's extensive criminal history should prevent him from being considered for release. 18 U.S.C. § 3582(a)(1). He has a lengthy and troubling criminal history. This is Porter's third conviction for possession of a handgun by a convicted felon. PSR ¶¶ 38, 40. Porter additionally has three prior convictions for crimes of violence, including two different robbery charges, PSR ¶¶ 34, 36, and an attempted murder charge, PSR ¶ 37. Despite having previously received multiple sentences of imprisonment, Porter has shown little respect for the criminal justice system, as demonstrated by his numerous prior convictions and the commission of the offense for which he is currently incarcerated.

Third, the need to provide just punishment and promote respect for the law, and the need for both specific and general deterrence, all weigh against reducing Porter's sentence. 18 U.S.C. § 3582(a)(2)(A), (B). Porter has yet to serve half of his 84 month term of incarceration. *See* Ex. B., Porter BOP Records, at 2. Releasing Porter after only serving 37 months of his sentence would send the wrong message to Porter and to other individuals who commit weapons offenses.

Accordingly, even if Porter was eligible for compassionate release, his motion should be denied based on the factors set forth in § 3553(a).

### D.    The Court Cannot Direct the BOP to Place Porter on Home Confinement

Finally, to the extent Porter is requesting this Court to order BOP to place him on home confinement, this Court should deny the request. District courts have no authority to direct BOP to place a defendant in home confinement. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Rather, such designation decisions are committed solely to BOP's discretion. *See* 18 U.S.C. § 3621(b); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It

12

is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). And here, as of July 30, 2020, the BOP has denied Porter's request for transfer to home confinement.

Moreover, a prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("The Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). And Section 3582(c)(1)(A) permits only a reduction in "the term of imprisonment," not a change in the place of imprisonment. Home confinement merely permits the inmate to serve out the term of imprisonment at home. Such a request therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Absent any other statutory authority, this Court has no authority to grant such relief in this forum.

## Conclusion

For the reasons set forth above, this Court should deny Porter's request for compassionate release.

Respectfully submitted,

Rachael A. Honig
Acting United States Attorney

By:   /s/ *J. Stephen Ferketic*
J. Stephen Ferketic
Assistant United States Attorney

cc:   Lisa Mack, Esq.

13