UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Crim. No. 18-244 (SRC) |
| v. : | |
| : | REPLY IN SUPPORT OF |
| TROY PORTER, : | *PRO-SE* MOTION FOR |
| Defendant. : | COMPASSIONATE RELEASE |

The government takes issue with Troy Porter's proffer of his hypertension and his race to support his request for compassionate release. But it does not, and, indeed, it cannot, dispute that both of those factors, independently and in concert, increase his risk to contract the virus and to have a more serious, even deadly case. It then focuses on the standard for compassionate release set forth in the Guidelines policy, even though that narrower standard only applies a court *reviews* a motion for release brought by the BOP and does not limit this Court's analysis of Mr. Porter's motion. And, finally, it misses the mark when it argues that this Court has no authority to order the BOP to order his release to home confinement; Mr. Porter has asked this Court to effect his release by modifying his sentence to time served with the special supervisory condition that he serve the remainder of his custodial term on home confinement, something that the Court is empowered to do under the First Step Act.

  As Mr. Porter demonstrated in his motion, the statutory requirements for sentence reduction are only that the Court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements. This Court need not confine itself to the constricted analysis of Guidelines § 1B1.13 because this provision was never updated to reflect the First Step Act's significant changes granting courts statutory authority to make a final determination. Those changes were, importantly, intended to "*increase* the use of compassionate release" by entrusting district courts with the discretion previously reserved for the director of the BOP and "allow[ing] district judges to consider the

vast variety of circumstances that may constitute 'extraordinary and compelling.'" *United States v. Brown,* 411 F.Supp.3d 446, 449, 451 (S.D. Iowa 2019) (emphasis added). Moreover, even the unamended provision contains a catch-all prong, § 1B1.13(D), that provides authority for courts to make an independent determination of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c).

Further, the Second, Fourth, Sixth, and Seventh Circuits have all ruled that because § 1B1.3 relies on pre-First Step Act law, it is not "an applicable policy statement" for defendant-initiated compassionate release motions. *See United States v. Brooker (Zullo)*, 976 F.3d 228, 236 (2d Cir. 2020) ("[I]f a compassionate release motion is not brought by the BOP Director, Guideline § 1B1.13 does not, by its own terms apply to it" and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary or compelling"); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) ("There is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered … to consider any extraordinary and compelling reason for release that a defendant might raise.'") (quoting *Zullo*, 976 F.3d at 230); *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."; *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. Nov. 20, 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the Sentencing Commission has not yet issued a policy statement 'applicable' to Gunn's request. And because the Guidelines Manual lacks an applicable policy statement . . . [a]ny decision is 'consistent' with a nonexistent policy statement."). Instead, the First Step Act allows courts to independently to determine what reasons, for purposes of compassionate release, are "extraordinary and compelling" under §1B1.3, cmt. n.1(D). *Brooker*, 976 F.3d at 237.

In opposing Mr. Porter's release, the government is continuing the miserly use

of compassionate release, a view so myopic that led the Department of Justice, Office of the Inspector General to conclude that compassionate release was not being used effectively or even in a consistent manner almost a decade ago,[1] failings that were confirmed again in 2016 by the Inspector General.[2] These deficiencies continue even after the Attorney General issued not one but two memos in the space of a week to direct the BOP focus on releasing vulnerable inmates efficiently; the BOP's response to those two emergency directives was described as "dysfunctional to the point of cruelty."[3] Inspections of BOP facilities by the OIG so far during the pandemic reveals that prisons have experienced "challenges to reducing the complex's population in a timely manner."[4] Mr. Porter urges this Court to avail itself of its authority under the First Step Act to reverse this stingy history and current morass of compassionate release by granting his request to modify his sentence.

Turning to the medical issues at hand, namely, that Mr. Porter's hypertension and his race make him more vulnerable to COVOD-19, both are appropriately considered by this Court to determine that he has established an "extraordinary and compelling" reason for his release. The government argues that under CDC guidelines, hypertension does not qualify. But the CDC itself reported that from January 22 through May 30, 2020, hypertension came under the umbrella of "cardiovascular disease," one of the top three conditions that resulted in "[h]ospitalizations were 6 times higher and deaths 12 times higher" than for other COVID-19 patients.[5] And a study in the Journal of the American Medical Association

---

[1] *See* US DOJ, Office of Insp. Gen., *The Federal Bureau of Prisons' Compassionate Release Program* (April, 2013) ("The Office of the Inspector General (OIG) found that an effectively managed compassionate release program would result in cost savings for the BOP, as well as assist the BOP in managing its continually growing inmate population and the significant capacity challenges it is facing. However, we found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided.").
[2] *See* Statement of Michael E. Horowitz, Inspector General, U.S. Department of Justice, before the United States Sentencing Commission at the hearing on "Compassionate Release and the Conditions of Supervision," at 3 ("DOJ IG Testimony").
[3] The New York Times, *The Coronavirus Crisis Inside Prisons Won't Stay Behind Bars* (Ed. June 25, 2020).
[4] DOJ, OIG, *Pandemic Response Report: Remote Inspection of Federal Correctional Complex Butner* at 3 (*Summary of Inspection Results*) (January, 2021).
[5] https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm?s_cid=mm6924e2_w. ("CDC MMW") (CDC specifically noted twice that cardiovascular disease in COVID-19 report included hypertension).

found that among 5700 patients in New York City who were hospitalized with COVID-19, the most common underlying medical conditions were hypertension (56.6 percent), obesity (41.7 percent) and diabetes (33.8 percent).[6]

Likewise, Mr. Porter's race, African-American, increases his risk. The government does not dispute that, because it cannot. Instead, it poses that underlying "systemic economic and social issues, including lack of access to health care [and] health insurance" contribute to that result, as does a higher disease prevalence in that population. It then offers that because he *now* has access to and is being treated by BOP medical staff, he cannot really claim that he is at greater risk. Mr. Porter urges the Court to disregard this absurd argument.

First, arguing Mr. Porter *now* has access to medical care necessarily recognizes that for decades, he did not. The government cannot plausibly maintain that the decades of inadequate health care that resulted in his hypertension were simply erased when Mr. Porter entered federal prison with its medical unit. And it cannot argue that Mr. Porter's current good luck in having access to BOP health care means that he should remain in prison.

Next, hypertension, and extremely high blood pressure, is far more common among Blacks than whites,[7] which the government couches as "the African-American community [having a] higher prevalence of underlying conditions[.]" That these outcomes are influenced by factors such as limited access to healthcare and racism is of no moment; the underlying reason matters not when the result is an increase in death rates because those rates apply across the board, including to those in BOP custody. Interestingly, the government raised no similar objection to Mr. Porter offering his sex as a factor, although social factors, including men's higher incidence

---

[6] Safiya Richardson, MD, MPH; Jamie S. Hirsch, MD, MA, MSB; Mangala Narasimhan, DO; et al, *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area,* JAMA, available at https://jamanetwork.com/journals/jama/fullarticle/2765184.

[7] *See* Rutger's Univ, Science Daily, *Extremely high blood pressure in African-Americans is 5 times the national average* (Jan. 30, 2019) (positing factors that could contribute to higher rate, including housing instability and racism), *available at* https://www.sciencedaily.com/releases/2019/01/190130133117.htm; Daniel T. Lackland, Dr.PH, *Racial Differences in Hypertension: Implications for High Blood Pressure Management* (Aug. 1, 2015) (

of cardiovascular disease, account in part for that.[8]

In other words, that the BOP is not to blame for those underlying factors is irrelevant; the BOP is just as surely not to blame for the disproportionately minority population it houses[9] but it nonetheless is tasked with managing that population in the most humane and safe way that it can. This Court can take into account factors not of the BOP's making that influence and impact those in its care and release those at highest risk, like Mr. Porter.

Mr. Porter is at risk, and the BOP's measures and ability to mitigate that risk fall woefully short of what is needed. The DOJ OIG has begun inspections of prisons for compliance with pandemic guidance and protocols. It has inspected two facilities, FMC Butner and FCI Milan, and released reports detailing the findings. The OIG first noted that in those select facilities that are able to test inmates more broadly, the positivity rate "has been substantial[;]" that included at Butner, a medical facility, which had >50% positivity rate back in June, 2020.[10]

The findings at Butner were alarming:

- Social distancing was "difficult" to implement and enforce because of the open layout of units in three of its five facilities;
- Butner was not complying with portions of the BOP's guidance on quarantines due to lack of space and the "high volume" of cases;
- Butner failed to quarantine inmates who tested negative but were then exposed to inmates known to be positive, in contradiction of BOP and CDC guidance;
- Attempts to reduce staff movement to mitigate the risk of spread across its facilities were unsuccessful; and
- The risk of cross-contamination between units was increased by staff who, despite actually having sufficient PPE, failed to change N95

---

[8] *See, e.g.,* Deitsche Welle, *Why do more men die from COVID-19?* (June 26, 2020, updated Dec. 17, 2020), *available at* https://www.dw.com/en/why-do-more-men-die-from-covid-19/a-53952130.
[9] These same racism and socio-economic difficulties also contribute to the federal prison population being 38.6% Black," *see* https://www.bop.gov/about/statistics/statistics_inmate_race.jsp, while the overall US Black population is approximately 1/3 of that, 13.4%, https://www.census.gov/quickfacts/fact/table/US/IPE120219.
[10] DOJ, OIG, *Pandemic Response Report: Remote Inspection of Federal Correctional Complex Butner* (January, 2021). Mr. Porter focuses on Butner, because it is a medical facility, rather than simply a regular prison. But the findings for FMC Milan were similar. *See* DOJ, OIG, *Pandemic Response Report: Remote Inspection of Federal Correctional Institution Milan* (January, 2021).

> respirators when moving between units with positive inmates and units where the inmates had tested negative.

Most concerning, however, for the purposes of this motion was the finding that:

> Although Butner worked to comply with the Attorney General's guidance on home confinement, the composition of the inmate population and the need to adapt to rapidly changing guidance presented challenges to reducing the complex's population in a timely manner.

In other words, even at a medical center the BOP cannot adhere to the Attorney General's directives to reduce populations by identifying those most vulnerable and transferring them to home confinement. And the medical center was unable to follow CDC and BOP health guidance. If a *medical center* cannot comply with CDC and BOP COVID-19 practices, what hope do regular prisons like Ft. Dix have to comply with these practices and guidance?

Moreover, these failings didn't impact only inmates. Staff rates have climbed steadily,[11] too, making Mr. Porter's request all the more pressing. And that increasing rate will not be ameliorated with the arrival of vaccines. On January 15, 2021, the BOP announced that 68 facilities had received the vaccine and first doses were expected to be administered in another month. While that is progress, that represents less than half of BOP facilities. Even more alarming, however, staff are not mandated to take the vaccine. According to the BOP itself, "roughly half" of staff offered the vaccine *opted out*. In other words, vaccination against the virus is not mandatory for those entering the prisons and those coming into close contact with inmates *despite the known risk to inmates,* the near-total efficacy of the vaccine[12], and the undisputed inability of contracting the virus from the vaccines.[13]

In this framework, the BOP's claims that it is the "correctional leader in the pandemic[,]" and that it's "highest priority [is] to continue to mitigate the spread of COVID-19 in our facilities[]" don't just ring hollow. They endanger lives of those for

---

[11] *See, e.g. Butner Pandemic Report* at iv.
[12] *See, e.g.,* The New York Times, *How Nine Covid-19 Vaccines Work* (updated Jan. 13, 2021), *available at* https://www.nytimes.com/interactive/2021/health/how-covid-19-vaccines-work.html.
[13] *See, e.g.,* Univ. of Chicago, *What to know about the COVID-19 vaccine* (Jan. 12, 2021), *available at* https://www.uchicagomedicine.org/forefront/coronavirus-disease-covid-19/what-to-know-about-the-covid-19-vaccine#:~:text=Can%20I%20still%20get%20COVID,would%20if%20you%20were%20unvaccinated.

whom the BOP is entrusted with caring, like Mr. Porter.

     Mr. Porter respectfully requests that this Court grant his request to reduce his sentence to time served and to impose home confinement for the 28 months he would otherwise have left to serve.  He thanks the Court for its thoughtful consideration.

                                    Respectfully,

                                    /s/Lisa M. Mack